Ash Robinson and Rhea E. Robinson v. Commissioner.
Robinson v. Commissioner
Docket No. 50308.
United States Tax Court
T.C. Memo 1954-165; 1954 Tax Ct. Memo LEXIS 82; 13 T.C.M. (CCH) 921; T.C.M. (RIA) 54270; 3 Oil & Gas Rep. 2133; September 30, 1954, Filed *82 Held, petitioner acquired oil royalties and mineral rights situated in Edwards County, Texas (near a lease in Val Verde County, Texas, which petitioner and associates were developing by drilling and which had promising prospects), primarily for investment and not for sale to customers in the ordinary course of trade or business and the gains from three sales of the property in 1950 were long-term capital gains and are entitled to capital gains treatment under section 117 of the Internal Revenue Code of 1939. J. L. Rothchild, Esq., Scanlan Building, Houston, Tex., for the petitioners. Paul M. Newton, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioners' income tax for the year 1950 of $1,497.04. The deficiency is due to one adjustment which the Commissioner has made to the $20,377.71 net income reported by petitioners on their return. That adjustment is: "(a) Additional income profits claimed as capital gains $4,415.76." This adjustment is explained in the deficiency notice as follows: "(a) You realized ordinary income and not capital gains from the sales of oil and gas leases. *83 "Gain on sales, fully taxable
$8,831.52
"Amount included for tax in
return
4,415.76
"Additional taxable income
$4,415.76"
Petitioners contest this adjustment by an appropriate assignment of error. Findings of Fact Petitioners are husband and wife and are residents of Houston, Texas. Their joint income tax return for the calendar year 1950 was filed with the Collector of Internal Revenue for the First District of Texas. For convenience, Ash Robinson will sometimes hereinafter be referred to as petitioner. Prior to 1937, petitioner was engaged in the real estate business in Houston. In 1937, he began buying and selling oil properties in addition to his activities in real estate. In 1939, he terminated his real estate business and since then has continuously devoted most of his time to the oil business. Petitioner listed "Oil" as his occupation or business on his income tax returns for the years 1946, 1947, 1950, and 1951. No designation of profession was made on his returns for the years 1948 and 1949. From time to time since 1937, petitioner has purchased various mineral and royalty interests in Texas, Louisiana, Mississippi, Alabama, and Florida and *84 has participated in the drilling of oil and gas wells in those states. Most of his purchases have been in so-called "wildcat" or unproven areas. Many of the properties purchased by him have become productive and have been retained by him. In addition, petitioner during this period has purchased for investment various stocks, bonds, and real estate. From 1946 through 1952, petitioner received the following amounts of income from oil royalties, prior to deductions for depletion and production taxes: 1946
$10,731.57
1947
14,839.90
1948
21,775.28
1949
15,423.65
1950
17,439.90
1951
22,886.28
1952
21,621.86 In addition to this income from royalties and the gains from the sales of property as hereinafter more fully described, petitioner also received income during the years 1946 through 1952 in comparatively minor amounts from dividends, interest, oil rentals, real estate rentals, and partnership distributions. In his activities in the oil business, petitioner built up a group of friends with whom he transacted business, purchasing mineral interests from them and selling mineral interests to them. This group numbered approximately ten and included lawyers, *85 business men and farmers in Houston, Texas, New Orleans, Louisiana, Selma, Alabama, Rolling Fork, Mississippi, and other cities. For many years there has existed a standing agreement between petitioner and this group of friends that if petitioner got any good oil property and wished to sell some of it, each of them would purchase some of it from him. When petitioner desired to sell any of his mineral holdings, a telephone call to any member of the group was all that was necessary on his part to initiate the sales process. No extensive sales efforts or "selling job" was required. During all years since 1937, substantially all of petitioner's sales of oil royalties and mineral rights were made to persons within this group of ten. Petitioner has held a brokerage license from the State of Texas continuously since about 1937. Since closing his real estate office he has not maintained an office as such for the conduct of his oil activities. He has never advertised oil properties for sale in trade journals or oil periodicals, nor does he solicit sales from the general public. At some time during ther latter part of 1949 or early 1950, petitioner, in conjunction with four other individuals *86 who were among the group of friends above mentioned, became interested in obtaining a block of leases in the area of the adjoining Texas counties of Edwards, Sutton, and Val Verde. To carry out this purpose, these individuals associated themselves into a partnership known as the Val Verde Venture. Petitioner felt that these counties were a promising area for oil development for the reason that there were several shutin gas wells in the vicinity and also several seepage oil wells. No pipeline had been built into the area, but inasmuch as major companies held many leases there, petitioner felt that if the area could be developed a pipeline into the field might be built. In addition, the Phillips Petroleum Company in about 1930 had drilled a well on the Edwards-Sutton County line which had blown out as a gas well. In early 1950, the Val Verde Venture was successful in obtaining a 6,400-acre block of leases in northeastern Val Verde County. At the same time, in late 1949 and early 1950, petitioner began purchasing for his own personal account royalties and mineral rights in Edwards and Sutton Counties in the general vicinity of the block of leases owned by the Val Verde Venture. *87 He purchased about 3,200 royalty and mineral acres in that area from late 1949 through about 1951. Included in this acreage were purchases on the following dates and at the approximate prices indicated: Date
County
Price
February 1950
Edwards
$ 8.25 per acre
July 1950
Sutton
10.40 per acre
October 1950
Edwards
6.25 per acre Petitioner made these purchases primarily for investment because he believed production of oil or gas would be obtained from the nearby Val Verde leases which he and his coventurers owned and were developing in Val Verde County. He did not make these purchases in Edwards and Sutton Counties to hold them "primarily for sale to customers in the ordinary course of his trade or business." In June 1950, the Val Verde Venture in which petitioner was one of the participants began the drilling of a well on its block of leases owned by them in Val Verde County. The drilling was more difficult and costiy than had been anticipated. After the drilling had commenced, petitioner found himself in such a position that he had to sell some of his personal interests in Edwards and Sutton Counties in order to help finance his part of the venture. On *88 or about February 10, 1951, after approximately 8 months of drilling, the well drilled by the Val Verde Venture came in as a producing gas well. Later two more producing wells were drilled. In March 1951, after the Val Verde Venture well had come in, petitioner purchased additional minerals in Edwards County, which he designated as the Stansberry minerals, for $10.60 per acre. Almost immediately, in March and April 1951, petitioner sold 700 acres of the Stansberry minerals to members of his group of friends for $23,450, or approximately $33.50 per acre. In April 1954, the time of the hearing in this proceeding, petitioner still owned 1,500 acres of the 3,200 acres purchased by him in the area of Edwards, Sutton and Val Verde Counties, Texas. The Val Verde Venture has drilled a total of 3 wells in the area and the gas produced therefrom is being marketed to the El Paso Natural Gas Company. None of the Edwards and Sutton Counties properties sold by petitioner in 1950 was producing income to him at the time of sale. Petitioners still, in 1954, retain 75 per cent of the royalty and mineral interests purchased by petitioner which have not expired by the terms of the instrument of *89 purchase, or were proven worthless by drilling dry holes. Petitioners still retain a number of producing and nonproducing royalty and mineral interests which were acquired more than 8 to 10 years ago. In the joint income tax return of petitioners for the year 1950, capital gains were reported on Schedule "D" of the return, as follows: "SCHEDULE 'D'
Selling
Long-Term Capital Gains
Acquired
Sold
Price
Cost
Profit
20 ac. Edwards County
2-25-50
9-26-50
$ 2,524.25
$ 165.00
$ 2,359.25
40 ac. Edwards County
2-25-50
10- 9-50
5,000.00
330.00
4,670.00
37.5 ac. Edwards County
2-25-50
12-18-50
2,111.65
309.38
1,802.27
$ 9,635.90
$ 804.38
$ 8,831.52
One-half taxable
$ 4,415.76
Short-Term Capital Gains
20.5 ac. Brooks County
3-24-50
3-22-50
$10,300.00
$2,283.70
$ 8,016.30
50 ac. Edwards County
2-25-50
3-22-50
1,350.00
412.50
937.50
50 ac. Edwards County
2-25-50
4-13-50
1,348.92
412.50
936.42
100 ac. Isaquena County
6- 2-50
6-15-50
1,062.00
325.00
737.00
125 ac. Isaquena County
- -2-50
7- 1-50
1,327.50
406.25
921.25
328.65 ac. Isaquena County
6- 2-50
7-21-50
3,286.50
1,068.11
2,218.39
100 ac. Isaquena County
6- 2-50
7-24-50
1,062.00
325.00
737.00
100 ac. Sutton County
7-18-50
9- 5-50
4,202.70
1,040.00
3,162.70
100 ac. Sutton County
7-18-50
9- 7-50
3,054.15
1,040.00
2,014.15
100 ac. Sutton County
7-18-50
9-11-50
1,031.65
1,040.00
(8.35)
50 ac. Sutton County
7-18-50
9-26-50
1,531.65
520.00
1,011.65
$29,557.07
$8,873.06
$20,684.01
Net Gain from Sale of Capital Assets
$25,099.77"
*90 Opinion BLACK, Judge: We have but one issue to decide in this proceeding and that is whether the gains which petitioners received from the sale in 1950 of 97.5 acres of mineral rights which they owned as community property in Edwards County, Texas, resulted in long-term capital gains as petitioners reported on their joint return or in ordinary income taxable at 100 per cent as the Commissioner has determined in his deficiency notice. There were three of these sales and petitioners' gains from them are not in dispute. Petitioners also reported eleven shortterm capital gains transactions in oil properties on their 1950 return. These short-term capital gains transactions were reported as 100 per cent taxable on account of the short time these properties were held and no controversy is before us as to them. There was considerable evidence bearing upon the issue we have here to decide, both oral and documentary, and after a careful weighing of this evidence we have concluded that the issue should be decided in favor of petitioners. The question here is factual. Its answer depends to a large extent upon the intent of the petitioner when he acquired the Edwards County properties *91 in 1950. This intent is to be ascertained from the testimony of petitioner and surrounding facts and circumstances. ; . When, at the hearing, petitioner was asked what his business was during the taxable year 1950 and for several years prior thereto, he replied: "A. Well, I buy properties and I develop them, and I buy real estate and I buy stocks and I buy oil royalties. The oil that I buy, usually, are oil royalties; sometimes I buy leases and drill them." Petitioner testified that in 1950 he bought quite a number of oil royalties and mineral rights in Edwards and Sutton Counties and that these acres were relatively close to a lease which he and four coventurers acquired in Val Verde County for development. They did develop the Val Verde lease, beginning the drilling of a well in 1950, and it was during this drilling that petitioner sold 650 acres of the oil royalties and mineral rights which he had acquired in Edwards and Sutton Counties. Petitioner testified that the drilling of the three gas wells in Val Verde County was very expensive. He explained that it was on account *92 of this expensive drilling that he sold some of his holdings in nearby Edwards and Sutton Counties to friends who were always anxious to buy in with petitioner when he found something which he thought would be profitable to them. Petitioner testified: "A. We started in drilling this Val Verde well. We didn't have any idea how rough that thing was. And it just kept getting rougher and rougher and rougher. And after eight months, I got, well, I not only couldn't buy any more, I had to get rid of something to keep that thing going down. And that's why I sold as many of these as I did at that time." As has already been explained, only three of the sales of this Edwards County property are in controversy. The other sales of Edwards County property were shortterm capital gains taxable at 100 per cent of gains and are not at issue here. During the course of petitioner's cross examination as a witness by respondent's counsel, the following question and answer occur: "Q. Isn't it also true that at the time you acquired each of these properties you really didn't know whether you were holding it for investment, speculation, development or subleasing? "A. Mr. Newton, that isn't correct *93 for this reason. I am getting old and my health hasn't been good for years, and I try to buy non-management properties. The properties I buy I have good information, what I consider good information, that they have a good chance to produce oil. I am willing to hold them all and let my estate hold them all, because there is no management concerned with it. I have tried to build up an income from the production of oil, which I have. * * * Now, I buy those properties for development and for income. But when you ask me the question if I would sell them all out if I got enough money, I would sell all of them if I got enough money for them, that's correct." In , which involved the question as to whether gains realized by the taxpayer from the sale of interests in oil leases in Callahan and Eastland Counties, Texas, were long-term capital gains or were to be taxed as ordinary income, we said: "It is respondent's contention that Bailey became a dealer in leases and made these sales in the 'course of his trade or business,' thus realizing ordinary income. Numerous tests have been employed to aid in the determination of whether property has been held *94 by a taxpayer 'primarily for sale to customers in the ordinary course of his trade or business.' The factor which must be given greatest weight is the purpose for which the property was held during the period in question. ; . This purpose must be determined from the evidence as to the intention of the taxpayer at the time of acquisition and his conduct during the holding period. * * * We have endeavored to apply this test in deciding the issue we have here and in doing so we have reached the conclusion that petitioner's three sales of the Edwards County property in 1950 which are here in controversy should be taxed as long-term capital gains. It is true, of course, as respondent argues, that one can be in two kinds of businesses, namely, buying and selling oil royalties and mineral rights for a profit and at the same time be in the business of investing in such properties for holding in the production of income. Cf. ; . Even if we assume, as respondent argues, that petitioner was in the business of buying *95 and selling oil royalties and mineral rights and had been in that business for several years and that was one of the businesses which he carried on in 1950, nevertheless, we would be unable to hold under the evidence in this case that the three sales involved here were made of property held "primarily for sale" in the course of petitioner's business. We think the property was acquired and held by petitioner for investment purposes and was sold primarily because he needed money to put up his part of the expensive drilling costs which were being incurred in drilling gas wells in Val Verde County by a joint venture of which he was a member. On this issue we hold for petitioner. Cf. Decision will be entered for the petitioners.